**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROCKY RATLIFF, | : | CIVIL CASE NUMBER 2:19-cv-04746 |
| | : | |
| PLAINTIFF, | : | |
| | : | JUDGE MICHAEL H. WATSON |
| -VS- | : | |
| | : | |
| | : | |
| THE OHIO STATE UNIVERSITY, | : | |
| | : | |
| DEFENDANT. | : | |

**AMENDED COMPLAINT**

Now comes the Plaintiff, Rocky Ratliff by and through Counsel, and states and avers as follows for his Amended Complaint against the Defendant The Ohio State University:

**JURISDICTION AND VENUE**

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1334 as the claims are matters in controversy that arise under the laws of the United States of America.  Specifically, the claims are asserted under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. and, the Civil Rights Act, U.S.C. § 1983, *et seq*.

2.     Venue is proper in the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b) as the events giving rise to the Plaintiffs' claims occurred within this Court's district.

**PRELIMINARY STATEMENT**

3.     This is a civil rights lawsuit being brought by a former student of The Ohio State University ("OSU") that is among the estimated 1,500 to 2,500 male students that were sexually assaulted, abused, molested, and/or harassed by their OSU Physician and Athletic Team Doctor, Dr. Richard Strauss, M.D.

4.     At OSU, Dr. Strauss was an employee, tenured faculty member, and the Associate
Director of OSU's sports medicine program.  He served as a physician in both the athletic
department and the OSU student health center.

5.     Dr. Strauss' OSU career spanned over nineteen (19) years from approximately 1979
through 1998.  Throughout his approximate nineteen (19) years at OSU as both a physician in
the athletic department and in the student health center, Dr. Strauss used his position of trust and
confidence as a physician to sexually molest, sexually assault, sexually abuse, and/or sexually
harass countless OSU male student-athletes and students.

6.     The Plaintiff consented to receiving medical treatment from Dr. Strauss while a student-
athlete and student at OSU.  However, as a student-athlete, he never consented to Dr. Strauss'
sexual molestation, sexual assault, sexual abuse, and/or sexual harassment as Dr. Strauss
frequently went beyond the stated medical purpose of his examinations, and his examinations
often were not consistent with the standard of care for medical examinations.

7.     Dr. Strauss was designated the team physician for many sports centered out of Larkins
Hall, including men's wrestling.  As such, student-athlete wrestlers were susceptible to Dr.
Strauss if they wanted to receive medical treatment.

8.     Larkins Hall was home to the OSU Varsity Wrestling Team as their practice facility.  The
wrestling locker room was located on the main floor, inside the general men's locker room.  The
wrestling locker room had a separate locked area with lockers located around the outside walls of
the room.  Also, the wrestlers shared a shower area, toilet area, and sauna area with the general
OSU population that included students, employees, faculty members, and staff of OSU.  Further,
the wrestlers would walk across a hallway to access their training room which was located on the
main floor of Larkins Hall.  This training area had approximately six (6) training tables,

approximately two whirlpools, and a private office area where the wrestlers would meet with Dr. Strauss. Further, most wrestlers accessed the wrestling room by walking up a private spiral staircase located at the end of the hallway that separated the locker room and training room. This spiral staircase ascended to the third floor wrestling room.

9.     After wrestling practice, the wrestlers would shower in the first floor general shower area. Here, wrestlers were often harassed not only by Dr. Strauss, but also by numerous students, employees, faculty members, and/or staff. These individuals harassed the wrestlers by leering and/or voyeuristically staring at the wrestlers while they showered. These individuals sometimes would shower with the wrestlers, stare at the wrestlers, and excessively lather their genital area. Moreover, some of these individuals became erect in the shower area and even masturbated while in the shower area. Also, some individuals voyeuristically stared at the wrestlers from inside a bathroom stall by looking through a crack in the door or by voyeuristically looking over the bathroom stall door.

10.     The OSU wrestlers would frequently use the sauna facilities at Larkins Hall, which was part of the general men's locker room. While using the sauna facilities, Dr. Strauss and other students, employees, faculty members, and/or staff would voyeuristically watch the wrestlers.

11.     In the locker room, shower area, toilet area, and/or sauna facilities, wrestlers were solicited for dates and sexual encounters.

12.     Members of the OSU wrestling team and OSU wrestling coaching staff consistently discovered male on male sexual encounters in the locker room, bathroom, sauna facilities, spiral staircase, and wrestling room.

13.     Further, each OSU athlete had to participate in a pre-season physical before the athlete was cleared to participate in their sport. Many times, these pre-season physicals were held in the

3

training room at the Woody Hayes Athletic Center.  During the pre-season physicals, athletes would participate in a number of stations that included a station for blood pressure, a station to check their reflexes, a station to make a mouthpiece, etc.  The final station would be a hernia examination with Dr. Strauss.

14.     As students progressed through the stations, the hernia station always took the longest. Here, Dr. Strauss would excessively fondle and inspect the genitals and anuses of athletes. These exams lasted approximately five (5) minutes to fifteen (15) minutes.

15.     Dr. Strauss would give explanations for the prolonged need for his medical exams. Frequently, Dr. Strauss would tell wrestlers that he was just being thorough, needed to check their lymph nodes, needed to check for STDs, and/or that he was checking for testicular cancer.

16.     Typically for a pre-season physical, Dr. Strauss would ask the athlete to enter the room. Dr. Strauss would shut the door and ask the athlete to undress.  Dr. Strauss would exam the athlete from his shoulders to his groin area.  Dr. Strauss would closely look at the athlete's skin, lifting the athlete's arms and running his hands down the wrestler's chest.  Then, Dr. Strauss would grab a stool on wheels and roll up to the athlete's groin area so the athlete's penis was at the height of Dr. Strauss' facial area.  Sometimes, Dr. Strauss would turn off the lights and would use a purplish light headlamp to examine the athlete.  Either way, Dr. Strauss' face was close enough that the athlete could feel his breath on his penis and testicles.  Typically, Dr. Strauss would hold the athlete's testicles in his left hand and he gently massaged the athlete's testicles.  With his right hand, Dr. Strauss would hold the athlete's penis and move the athlete's penis in different directions so as to appear to be examining the shaft of the athlete's penis.  Dr. Strauss would continue this examination with the athlete for approximately five (5) minutes to fifteen (15) minutes.  Once completed, occasionally, Dr. Strauss would ask the athlete to turn

around.  Dr. Strauss would instruct the athlete to put his hands on his buttocks and spread the

athlete's buttocks.  Then, Dr. Strauss would instruct the athlete to cough.  During this anus

examination, Dr. Strauss would still be on his stool with the athlete's buttocks approximately one

(1) foot from Dr. Strauss' face.  Dr. Strauss failed to use examination gloves during the pre-

season physicals.

17.     In April 2018, OSU authorized an independent investigation into whether Strauss had

sexually abused students-athletes, and if so, the extent to which OSU knew about Strauss'

conduct. The law firm of Perkins Coie, LLP conducted approximately a yearlong independent

investigation that interviewed over five hundred (500) individuals with a cost to OSU of over six

(6) million dollars. On May 15, 2019 Perkins Coie, LLP issued a report with findings from its

independent investigation into Strauss' acts of sexual abuse and the degree to which OSU knew

of or permitted Strauss to abuse OSU students, titled, *Sexual Abuse Committed by Dr. Richard*

*Strauss at the Ohio State University*, issued on May 15, 2019. This report substantiated many of

the facts that are pled in this Complaint and the previous Consolidated Complaints pending

before this Court.  The Perkins Coie report found that Dr. Strauss had sexually abused at least

177 male student-patients that he was charged with as an OSU Physician and that the University

personnel had knowledge of Strauss' sexually abusive treatments of male student-patients as

early at 1979, but that complaints and reports about Strauss' conduct were not elevated beyond

the OSU Athletics Department or OSU Student Health until 1996.

18.     The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics

Act (known as the Clery Act) signed in 1990 is a federal statute codified at U.S.C.§ 1092 with

implementing regulations in the U.S. Code of Federal Regulations at 34 C.F.R. 668.46.  This

federal statute requires U.S. colleges and universities participating in federal financial aid

programs to maintain and disclose campus crime statistics and security information on or around their campuses.  The Act is enforced by the U.S. Department of Education.  As a result of the Clery Act, OSU has been required to file annual security reports since 1991.  Even though OSU Team Doctor and Employee Dr. Strauss had been sexually harassing and molesting OSU male athletes and male students since 1979, OSU never reported these sexual abuses till 2019 when OSU reported in 2018 that there were thirty (30) incidents of rape on campus by Dr. Strauss and nine hundred ninety two (992) incidents of fondling on the OSU campus by Dr. Strauss.

19.    The Clery Act also requires universities to send timely warnings to their university community when there are known risks to public safety on campus.  By October of each year, universities must publish and distribute their annual campus security report.  This report is required to provide crime statistics for the prior three years, policy statements regarding various safety and security measures, campus crime prevention program descriptions and procedures to be followed in the investigation and prosecution of alleged sex offenses.

20. As categorized by the Perkins Coie Report, Strauss abused the Plaintiffs and other OSU students in one or more of the following ways:

   a. In the context of a medical examination that caused the student to reach ejaculation or nearly ejaculation;

   b. In the context of a medical examination that caused the student to reach erection or near erection;

   c. Unnecessary fondling or groping of the genitals in the context of a medical examination, or medically unnecessary examinations of the genitals or rectum;

   d. Examination techniques that included: unnecessary nudity, excessive touching of non-genital/ non-rectal areas of the student's body; inappropriate verbal commentary or sexually

charged questioning; lack of medical gloves for genital examinations; unnecessarily invasive physical positions; medical treatment outside of a clinical setting; and *quid pro quo* arrangements; and

e. Inappropriate and sexually abusive conduct outside of the examination room, including showering alongside student-patients, loitering in student athlete's locker rooms and engaging in voyeuristic behavior, and initiating fraternization with patients.  (See Perkins Coie Report p. 40).

21. Even though the Perkins Coie Report released on May 15, 2019 reflects the significant number of OSU people in 2018 and 2019 who admitted to the investigators that they knew about Dr. Strauss' disgusting sexual tendencies, there are nonetheless many other OSU employees and agents who did not admit to knowing about Dr. Strauss due to memory lapses, death, mental disability, selective amnesia, or a failure to cooperate with the investigators of Perkins Coie for the fear of their own potential personal liability for failure to report or disclose the abusive or sexual misconduct by Dr. Strauss.

 22. The Perkins Coie investigation and report disclosed that at least the following OSU officials received reports about Dr. Strauss.  Two (2) OSU Athletic Directors, Two (2) OSU Head Team Physicians, Six (6) OSU Assistant Athletic Directors, Five (5) OSU Team Physicians, Twenty-Two (22) OSU Coaches, One (1) OSU Athletic Training Director, Four (4) OSU Athletic Trainers, Eighteen (18) OSU Student Trainers, Four (4) OSU Student Health Officials and , Three (3) OSU Student Health Employee. In addition, there was an unknown number of OSU personnel executives, lawyers, trustees, and/or OSU officials that were aware of the complaints against Strauss.

23. The name of the OSU officials that received reports or student complaints about the sexual conduct of Dr. Strauss include but are not limited to the following:

      a.      OSU Athletic Director, Jim Jones;

      b.      OSU Athletic Director and Assistant University Vice President, Andy Geiger;

      c.      OSU Assistant Athletic Director Kate Riffee;

      d.      OSU Head Medical Director and Head Team Physician Dr. John Lombardo;

      e.      Assistant OSU Athletic Director Archie Griffith;

      f.      Assistant OSU Athletic Director Larry Romanoff;

      g      OSU Vice President David Williams;

      h.      OSU Head Team Physician and Director of Sports Medicine Dr. Bob Murphy;

      i.      Associate OSU Athletic Director Paul Krebs;

      j.      OSU Student Health Director Dr. Forrest Smith;

      k.      OSU Tennis Team Physician Trent Sickles;

      l.      OSU Student Health Center Sports Medicine Clinic Director David Henderson;

      m.      OSU Director of Athletic Training Bill Davis;

      n.      OSU Director of Student Dr. Ted Grace;

      o.      OSU Head Fencing Coach Charlotte Remenyik;

      p.      OSU Head Wrestling Coach Russ Hellickson;

      q.      OSU Head Assistant Wrestling Coach Jim Jordan;

      r.      OSU Head Trainer Vince O'Brien;

      s.      OSU Track and Field Coach Frank Zubovich;

      t.      OSU Swimming Coach Dick Sloan;

      u.      OSU Athletic Director Hugh Hindman;

      v.      OSU Assistant Athletic Director Richard Delaney;

      w.      OSU Co-Head Athletic Trainer Billy Hill

      x.      OSU Athletic Academic Counselor James Hall

      z.      OSU Head Basketball Trainer Mike Bordner.

24.      On May 17, 2019 OSU President Dr. Michael Drake and OSU Board of Trustees Chair Michael Gasser issued a letter to members of The Ohio State University that stated the findings of the independent investigation were shocking and painful to comprehend. The two OSU leaders offered their profound regret and sincere apologies to each person that endured Dr. Strauss' abuse, and for the OSU's fundamental failure at the time to prevent the abuse. They further stated that university personnel at the time had knowledge of complaints and concerns about Dr. Strauss' conduct, as early as 1979 but failed to investigate or act meaningfully. In addition, they stated that "On behalf of the university, we offer our profound regret and sincere apologizes to each person who endured Dr. Strauss' abuse and for our institution's fundamental failure at the time to prevent the abuse."

25.      Once the Perkins Coie Investigative report was released on May 15, 2019 and the letter from the OSU President Dr. Michael Drake and OSU Board of Trustees Chair Michael Gasser was released on May 17, 2019 which resulted in extensive nationwide media coverage, the Plaintiffs came to the following realizations:

      a.   Dr. Strauss' conduct during the physical and medical examinations was not medically necessary and was in fact sexual assault;

      b.   There was a tremendous magnitude and widespread scope of sexual abuse to OSU students by Dr. Strauss;

c.   OSU had knowledge of Dr. Strauss' sexual abuse of male students for decades and chose to ignore this sexual abuse;

d.   OSU had received repeated and numerous complaints about Dr. Strauss and his prolonged genital examinations and other disturbing sexual inclinations and proclivities but OSU took no actions against him;

e.   OSU Athletic Directors Assistant, Assistant Athletic Directors, Coaches, Trainers, Administrators, Physicians, Deans and other OSU employees all knew about the complaints and reports made by OSU students and did nothing; and

f.   The plaintiff was not the only one sexually molested and sexually assaulted but many, many other OSU students had been sexually assaulted, raped, sodomized, groped, fondled, masturbated, digitally penetrated, and emotionally scarred between 1979-1998 due to OSU's total and deliberate indifferences to the actions of Dr. Strauss. As stated in the OSU Letter of May 17, 2019 there was a "fundamental failure at the time to prevent the abuse"

26.   Plaintiff takes no pleasure in bringing this lawsuit. OSU is an esteemed institution of the higher learning and he continues to love OSU dearly and remain devoted member of The Buckeye Nation. As such, Plaintiff has an extremely difficult time understanding how the state up north can fully acknowledge and compensate the victims/ survivors of sexual abuse, whereas a leading Big 10 institution such as OSU has struggled to do so.

27.   Plaintiff who was an OSU athlete was honored to represent OSU in competitive NCAA Division I athletics and did his best to continue the University's tradition of excellence.

28.   Plaintiff honorably attended OSU expecting the University would provide him with a safe and supportive environment that would help him perform both academically and athletically.

29.     Plaintiff believed that OSU Team Physicians like Dr. Strauss hold a special relationship of trust and confidence with their student-patients.  These physicians become even more important to a NCAA Division I athlete as student-athlete requires immediate treatment in order to compete in the rigors of their respective sport.

30.     Plaintiff trusted OSU to act in his best interests when selecting, training, and supervising the team physicians on its faculty, which included the need to regularly and competently evaluate the quality of care and the integrity of the medical services that Dr. Strauss provided to OSU's students and athletes.

31.     Plaintiff trusted that OSU personnel would not conceal, disclose, or disregard known circumstances that raised a substantial likelihood that Plaintiff would be sexually molested, sexually assaulted, sexually abused, and/or sexually harassed by Dr. Strauss.  Likewise, Plaintiff trusted that OSU personnel would not conceal, disclose, or disregard known circumstances that raised a substantial likelihood that Plaintiff would be sexually harassed and sexually abused at the athletic facility of Larkins Hall.

32.     However, instead of taking action to stop Dr. Strauss' sexual abuse, OSU not only turned a blind eye to his sexual abuse, but facilitated the abuse, and concealed the abuse.  OSU required its student-athletes to see Dr. Strauss for annual physicals and medical treatment in order to participate in university sports and maintain their athletic scholarships, even after student-athletes complained to their coaches about the ways Dr. Strauss touched them during medical examinations.  At least one coach threatened athletes with having to see Dr. Strauss if they did not listen to the coach.

33.     OSU administrators and employees of Student Health Services also facilitated and concealed Dr. Strauss' abuse.  For example, after a student lodged a complaint detailing Dr.

Strauss's inappropriate sexual touching and comments during an examination, the Director of Student Health Services legitimized the abuse and concealed the abuse by telling the student that no one had complained about Dr. Strauss before and that Dr. Strauss had said the examination was medically appropriate.

34.     At all times relevant to this complaint, OSU officials with the authority to institute corrective measures actively concealed, failed to disclose, and showed deliberate indifference towards circumstances that indicated Dr. Strauss was sexually abusing male student-athletes and students.

35.     At all times relevant to this complaint, OSU personnel failed to implement corrective measure despite having actual knowledge Dr. Strauss was sexually abusing students and Larkins Hall presented a sexually hostile environment to male student athletes.

36.     OSU officials knowingly, intentionally, and/or recklessly aided, abetted, and/or concealed Dr. Strauss' sexual predation on its student-athletes and students.  OSU ignored complaints and disregarded commonly known information and improper and/or inappropriate practices used by Dr. Strauss over his nineteen (19) year career.

## **PARTIES**

37.     The Plaintiff hereby incorporate by reference the allegations set forth and contained in Paragraphs One (1) through Thirty-Six (36) as if fully written herein.

38.     Defendant The Ohio State University (hereinafter referenced as OSU) was at all relevant times contained herein and presently continues to be a public university organized and existing under the laws of the State of Ohio.

39.     Defendant OSU received at all relevant times contained herein and presently continues to receive federal financial assistance, which subjects OSU to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq*. and, the Civil Rights Act, U.S.C. § 1983, *et seq*.

40.     At all relevant times herein, Plaintiff was enrolled at OSU as a student during Dr. Strauss' employment with OSU.

41.     Plaintiff participated in NCAA Division I intercollegiate athletics, while enrolled at OSU as a member of OSU's Varsity Wrestling Team.

42.     Plaintiff Rocky Ratliff is a resident of Marion, Ohio.  He is a 1993 graduate of Marion Harding High School, where he was a three (3) time OHSAA Wrestling State Qualifier and 1993 State Runner-up.  Plaintiff was a former scholarship athlete and two-year starter for the varsity wrestling team at Hofstra University in Hempstead, New York.  In 1995, Plaintiff transferred to OSU to be a member of the OSU Varsity Wrestling Team.

43.     Plaintiff attended OSU from the years of 1995-1997.  Plaintiff earned his Bachelor's Degree in Political Science from OSU, a Masters Degree from Tiffin University, and his Juris Doctorate from Thomas M. Cooley Law School in Lansing, Michigan.  While at OSU, Plaintiff was a two (2) year member of the varsity wrestling team from 1995 to 1997.

44.     Plaintiff believes that he was examined approximately twenty (20) times by Dr. Strauss for a physical, injuries, skin infections, and/or sickness and Dr. Strauss sexually assaulted Mr. Ratliff approximately twelve (12) times.

45.     Plaintiff was inappropriately groped in his genital area by Dr. Strauss when he was examined for his physical, strep throat, flu, high ankle sprain, and a carbuncle on the back of his neck.

46.     Plaintiff recalls that Dr. Strauss sexually assaulted the Plaintiff to the point where he was near erection several times as Dr. Strauss attempted to masturbate the Plaintiff.  This occurred on approximately four (4) occasions.

47.     Plaintiff states that Dr. Strauss never used any medical gloves during Plaintiff's exams unless Dr. Strauss dealt with blood.

48.     Plaintiff states that he had almost daily molestations from Dr. Strauss for a period of approximately three (3) weeks due to a carbuncle on the back of his neck.  In addition, Plaintiff states that when Dr. Strauss went to drain the carbuncle, Dr. Strauss would put his clothed semi-erect penis on Plaintiff's right shoulder blade.  As Dr. Strauss would pop and/or drain Plaintiff's carbuncle, Dr. Strauss would move his semi-erect penis into Plaintiff's shoulder blade area.

49.     Plaintiff states that Dr. Strauss would shower with the wrestlers almost daily.  Dr. Strauss would constantly voyeuristically watch the wrestlers in the showers, locker room, and sauna area.

50.     Plaintiff states that his teammates would constantly tell Dr. Strauss to turn around in the shower and Dr. Strauss would do a complete three hundred and sixty (360) degree turn and start watching the wrestlers again.

51.     Plaintiff states that Larkins Hall had numerous individuals that would frequent the shower and sauna area to watch the wrestlers.  These individuals would sometimes masturbate to the wrestlers and/or walk around the wrestlers with erections.  Occasionally, male predators would masturbate from behind the toilet stall door as they voyeuristically watched the wrestlers shower.

52.     Plaintiff states that there were multiple meetings where OSU Head Wrestling Coach would explain to the team that they needed to look out for one another in Larkins Hall but he was

doing everything possible to get the wrestling team to a new facility and a better training environment.

## **FACTS**

53.     The Plaintiff hereby incorporate by reference the allegations set forth and contained in Paragraphs One (1) through Paragraphs Fifty-Two (52) as if fully written herein.

54.     Defendant OSU employed Dr. Richard Strauss, M.D., as a faculty member from approximately September 1978 until approximately March 1, 1998.

55.     In approximately September 1978, Dr. Strauss started with OSU as an Assistant Professor in the College of Medicine.  Months later, Dr. Strauss was volunteering with the University Athletics Department as a team physician for several teams located in Larkins Hall.

56.     By approximately 1980, Dr. Strauss was serving as an Associate Director of the Sports Medicine program.

57.     By approximately 1981, Dr. Strauss began an appointment in the Athletics Department, including medical responsibilities at the Sports Medicine Clinic located in the University's Student Health Services.

58.     Over the years, Dr. Strauss' responsibilities as a team physician expanded beyond Larkins Hall to other athletic facilities, which included: the Woody Hayes Athletic Center, Ernie Biggs Athletic Training Facility, and St. John Arena.  Moreover, Dr. Strauss treated patients at Student Health Services.

59.     Dr. Strauss was granted tenure by OSU as an associate professor in approximately 1983.

60.     Dr. Strauss was granted a full professor with tenure by OSU in approximately 1992.

61.     In addition to his above duties, in approximately 1994, Dr. Strauss also began a part-time appointment treating students on the third floor of Wilce Student Health Center.

62.     In approximately March 1998, Dr. Strauss voluntarily retired and was granted Emeritus Status by the OSU Board of Trustees in the School of Public Health.  Dr. Strauss' Emeritus Status was bestowed upon him despite the lack of review or approval from the Dean of the College of Medicine and Public Health.

63.     Over his career, Dr. Strauss treated male student-athletes in the following sports: swimming, diving, wrestling, gymnastics, fencing, lacrosse, hockey cheerleading, volleyball, soccer, track, golf, baseball, tennis, water polo, and football

64.     During the above stated times and/or years and while working for Defendant OSU, Dr. Strauss sexually abused the Plaintiffs and other OSU Students under the guise of medical treatment during their medical examination in one or more of the following ways:

        a.      Dr. Strauss extremely manipulated or stimulated his student-patient's genitals, which included unwanted oral sex, anal digital penetration, masturbation, attempted masturbation, and fondling that caused ejaculation or near ejaculation;

        b.      Dr. Strauss fondled the student-patient to the point of erection or near erection;

        c.      Dr. Strauss performed prolonged and/or medically unnecessary genital and rectal exams;

        d.      Dr. Strauss committed other inappropriate and abusive practices toward his student-patients such as unnecessary nudity of the student-patient, excessive touching and/or groping of the student-patient, verbal commentary and inappropriate questions, lack of examination gloves, inappropriate physical position and/or invasion of space of the student-patient, performing treatments outside of a clinical setting, and "quid pro quo" arrangements with the student-patient; and

16

      e.      Dr. Strauss inappropriately showered alongside student-patients, loitered in student-athletes locker rooms, engaged in voyeuristic behavior, and initiated fraternization with student-patients by calling their residences, inviting them to lunch/dinner and paying for their meals, and asking to take pictures of the student-patients to help them start a modeling career.

65.      Strauss committed the above-mentioned acts of sexual abuse and sexual harassment consistently on an almost daily basis as an OSU faculty member and OSU athletic team physician.

66.      As set forth below, Plaintiff as student-patient was vulnerable to Strauss' sexual abuse and the student-patient was not able to identify Strauss' conduct as sexual abuse when it occurred.

67.      Plaintiff was treated by Dr. Strauss in his official capacity as an OSU Team Physician and/or medical doctor working for OSU.

68.      Plaintiff had little and/or no experience with medical doctors and/or examinations without his parents being present.  Plaintiff were taught to respect his elders and were under the belief that an OSU Team Physician and/ or medical doctor working for OSU had his best health interest in mind during his examination.

69.      The Plaintiff who was an OSU athlete attributed and/or rationalized Dr. Strauss' inappropriate behavior as being the thoroughness needed for participation in NCAA Division I Athletics, which said Plaintiff knew he had to undergo a pre-season physical in order to participate.

70.      Plaintiff was sexually assaulted and/or abused by Dr. Strauss under the guise of legitimate medical examinations.

71.     Plaintiff, an OSU Athlete, was compliant with the Dr. Strauss as his OSU Team Physician in order to regain his good health to compete, in order to be cleared to compete, and/or represent OSU to the best of his ability.

72.     Plaintiff, an OSU Athlete, was not educated nor taught that male sexual abuse could exist even within the confines of the OSU Athletic Department.  Further, male sexual abuse was not a commonly acknowledged problem or commonly discussed among non-educators or people outside the medical field.

73.     Dr. Strauss preyed upon the Plaintiff with his superior medical knowledge and was able to dispel any of the Plaintiffs' objections with this knowledge.  Plaintiff did not have the education and/or experience in the medical field to limit Dr. Strauss' physical contact during his examinations.

74.     Plaintiff believed and trusted OSU.  Plaintiff believed OSU would protect, inform, and/or remove him from harmful situations, even if it involved his Team Physician and/or an OSU medical doctor. Plaintiff attended OSU with the expectation that the University would consistently provide him with a safe and supportive environment that would help him thrive.

75.     Plaintiff, an OSU Athlete, believed that accusing an OSU Professor and/or Team Physician of committing sexual assault would risk his status on the team and/or their athletic scholarship as well as their status as a student at OSU.

76.     Plaintiff, an OSU Athlete, feared being ridiculed and/or ostracized if he complained to his teammates and the teammates failed to report similar experiences.

77.      Plaintiff had no options in his treatment.  OSU provided their medical staff and facilities. Plaintiff needed to see Dr. Strauss not only to heal quickly, but also, to save time, and/or money, as well as to be cleared to compete for OSU.

78.     OSU led Plaintiff to believe that Strauss' sexually abusive examinations, methods, and statements were medically acceptable behavior and/or practices.

79.     As previously alleged not until 2019, Plaintiff had a reasonable basis for believing that OSU had actual knowledge that Dr. Strauss was sexually abusing male students in a clinical setting.

80.     As previously alleged not until 2019 did Plaintiffs have a reasonable basis for believing that OSU concealed or remained deliberately indifferent to the substantial risk that Dr. Strauss was sexually abusing him and other OSU male students.

81.     As previously alleged, not until 2019, did Plaintiff have any reasonable way of knowing that OSU had actual knowledge that Dr. Strauss was sexually abusing male student-athletes and students in a clinical setting.  Plaintiff had no way of learning what and when OSU knew about Dr. Strauss and/or how OSU chose to permit continued sexual abuse by Dr. Strauss.  Plaintiff could not have exercised reasonable due diligence that would have revealed how OSU's acts and omissions caused Plaintiff to suffer independent injuries from the injuries caused by Dr. Strauss.

82.     OSU had a deliberate indifference toward Dr. Strauss' conduct as student-athletes, students, and a few OSU staff reported and referred complaints about Dr. Strauss to various OSU officials and employees throughout Dr. Strauss' career but OSU did nothing.

83.     At all relevant times in regard to this Complaint, and on information and belief, OSU staff and/or employees with authority to stop Dr. Strauss' access to patients failed to prevent Dr. Strauss from sexually abusing patients in a clinical setting, and/or implement other corrective measures as OSU had actual knowledge that there was a substantial likelihood that Strauss was sexually assaulting and abusing male student-athletes and male students.  Moreover, OSU had actual knowledge that Dr. Strauss posed a substantial risk of sexual abuse as early as 1979.

84.    OSU employees in the Sports medicine program and the Athletics Department had actual knowledge that Dr. Strauss was conducting prolonged genital exams and that Dr. Strauss refused to allow athletic training staff to be present during such exams.

85.    OSU, through its own administrators, faculty, and staff, had actual notice of Dr. Strauss' sexual abuse of male student-athletes and students.  Yet, OSU denied, dismissed, disregarded, minimized, refuted, silenced, and even concealed complaints about Dr. Strauss' sexual misconduct.  Even though OSU had evidence that Dr. Strauss was a substantial risk to their male student-athletes and male students, OSU failed to act.  On Plaintiff's information and belief, OSU willfully allowed Dr. Strauss to prey amongst its male student-athletes and male students, even though many high ranking officials such as Athletic Directors, Assistant Athletic Directors, Associate Athletic Directors, Head Team Physicians, Team Physicians, and Athletic Trainers could have taken action to prevent this systemic sexual abuse.

86.    Further, nurses at Student Health Services made various complaints regarding Dr. Strauss.  These complaints were that Dr. Strauss showed up unannounced to treat patients, performed prolonged examinations behind closed doors, and failed to chart and/or fill out medical records, which was and continues to be a standard medical practice in order to document a patient's medical history and provide follow-up care.

87.    Plaintiff believes this lack of medical documentation is troubling and OSU allowed Dr. Strauss to continue to disregard charting and/or filling out of important medical documentation. This lack of documentation allowed Dr. Strauss to misrepresent the nature of a patient's visit and/or allowed Dr. Strauss to deny whether he even examined the said patient.

88.    OSU also failed to direct Strauss to stop showering and/or sharing a locker room with their male student-athletes, failed to direct a third person from the training staff to be present

when treating their male student-athletes, failed to properly investigate any of reports and/or rumors, and failed to have a meaningful sexual abuse policy for its students.

89.  Simply put, OSU failed its male student-athletes and male students from the years 1979-1998 as OSU had actual knowledge that their employee and faculty member, Dr. Strauss, was a sexual predator and OSU was deliberately indifferent to these facts.

90.  Additionally, OSU failed to address the sexual harassment in its athletic facility at Larkins Hall.

91.  Larkins Hall was home to many sports such as swimming, diving, gymnastics, fencing and wrestling.

92.  In Larkins Hall, the OSU Varsity Wrestlers were victims of a harassing environment that allowed OSU's faculty, staff, and students to voyeuristically leer and/or stare at these wrestlers as they showered or used the sauna facilities.

93.  Further, male on male sexual interactions were frequent in areas of Larkins Hall that were frequented by the OSU wrestling team.  There were instances of male on male sexual encounters in the bathroom, the sauna, the private winding stairwell entrance to the wrestling room, the wrestling room, and the bathroom in the hallway outside of the wrestling room.

94.  The OSU Wrestling Coaches repeatedly tried to secure a separate shower facility for their wrestlers and/or move their wrestlers into a separate facility.  Further, in approximately 1995, two wrestlers approached OSU Athletic Director with schematic drawings to separate the wrestlers into their own space. OSU Athletic Director reported to the wrestlers that these plans would be too expensive.  As a concession, the OSU Athletic Department cleaned the wrestling locker room carpets that week.

95.     The wrestling coaches consistently asked for better accommodations as the Larkins Hall sexual harassment environment seriously impacted the psyche and morale of the OSU Wrestling Team.  The OSU wrestling coaches would even address the team as to this issue and continually informed the wrestlers that the OSU wrestling coaching staff was doing everything the staff could do to remove the team from the sexual harassment.

96.     Dr. Strauss was a part of the sexual harassment environment of Larkins Hall.  Dr. Strauss took long showers with the wrestling team.  During these showers, Dr. Strauss would voyeuristically stare at the wrestlers.  After his shower, Dr. Strauss would enter the wrestling locker room and position himself to leer at the wrestlers as he patted himself dry.  Additionally, he would use the sauna facilities with the wrestlers and voyeuristically watch them.  Dr. Strauss' showering obsession was to the point that he would sometimes reduce his examination times to allow him to shower.  Moreover, many wrestlers saw Dr. Strauss take more than one shower in a short amount of time, which allowed Dr. Strauss to voyeuristically gaze at his "favorite wrestlers."

97.     OSU had actual knowledge that their OSU Varsity Wrestling Team was being sexually harassed in Larkins Hall and OSU was deliberately indifferent to these facts.  Even though OSU knew of Larkins Hall's sexually hostile environment, OSU took zero steps to protect their student-athletes.

98.     OSU had actual knowledge that their employee and faculty member, Dr. Strauss, was showering and using the wrestling locker room as well as other male sports' locker rooms in Larkins Hall and OSU was deliberately indifferent to these facts.

## **CAUSES OF ACTION**

## **FIRST CAUSE OF ACTION – VIOLATIONS OF TITLE IX, 20 U.S.C. §1681(a), et seq.**

22

99.     The Plaintiffs hereby incorporate by reference the allegations set forth and contained in Paragraphs One (1) through Paragraphs Ninety-Eight (98) as if fully written herein.

100.    Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1631(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…."

101.    Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part 106.34 C.F.R. § 106.86(b) provides:"…A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

102.    As explained in Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, sexual harassment of students is a form of sex discrimination covered by Title IX.

103.    Title IX covers all programs of a school that receives any federal financial assistance, and covers sexual harassment, including sexual assault, by school employees, students, and third parties.

104.    Sexual harassment is defined as unwelcome conduct of sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature when either:

        a.      the conduct is made as a term or condition of an individual's employment, education, living environment or participation in a University community;

       b.     the acceptance or refusal of such conduct is used as the basis or a factor in decisions affecting an individual's employment, education, living environment, or participation in a University community;

       c.     the conduct unreasonably impacts an individual's employment or academic performance or creates an intimidating, hostile or offensive environment for that individual's employment, education, living environment, or participation in a University community.

105.   At all relevant times contained herein, OSU received federal financial assistance. As a result, OSU is subject to Title IX 20 U.S.C. §1681(a), et seq., OSU owed Plaintiff a duty to act prudently and with reasonable care, and otherwise to promptly investigate all allegations of sexual harassment, sexual assault, and sexual abuse regarding Dr. Strauss as he was an OSU employee, faculty member, and Team Physician.

106.   OSU subjected the Plaintiff and other OSU students to Dr. Strauss, who sexually molested, assaulted, abused, and sexually harassed the Plaintiff.  This included, but is not limited to, the following:  performing unwanted oral sex, fondling of their testicles, fondling of their penises, digitally penetrating their anuses, rubbing his erect genitals on their bodies during an examination, voyeuristically staring at them while they showered, making sexual comments and other inappropriate comments toward them, calling them at their residences, inviting them and taking them to lunch/dinner, and asking the Plaintiff to take semi-nude photographs. All of these actions were all acts of sexual discrimination under Title IX.

107.   OSU had actual knowledge of the serial and consistent sexual molestation, assault, abuse, and harassment and permitted it to continue unchecked throughout Dr. Strauss' employment.

108.    From approximately 1979-1998, male student-athletes, male students, and coaches conveyed complaints and concerns regarding Dr. Strauss' inappropriate sexual conduct to OSU administrators and employees.

109.    Given the magnitude of Dr. Strauss' abuse-involving students and student athletes he evaluated and treated over the span of two decades, it would implausible for OSU to claim that it did not know about Dr. Strauss' sexual abuse.

110.    OSU was required to promptly investigate and address Plaintiffs' (and other OSU students') allegations, reports and/or complaints of other unwelcome, inappropriate touching and comments by Dr. Strauss, but OSU did not do so.

111.    OSU created and was deliberately indifferent to a sexually hostile culture withing its athletic and student health programs, by, among other things:

a.      Mishandling students' reports about Dr. Strauss' conduct and/or discouraging students from reporting Dr. Strauss's conduct:

b.      Failing to promptly and appropriately investigate, remedy, and respond to complaints about Dr. Strauss' conduct;

c.      Promoting Dr. Strauss and increasing his access to OSU students, despite students' complaints about Dr. Strauss' conducts;

d.      Failing to adequately supervise Dr. Strauss, after learning that he posed a substantial risk to the safety of male students and student-athletes;

e.      Failing to take corrective action to prevent Dr Strauss from sexually harassing other students;

f.      Requiring student-athletes to see Dr. Strauss for annual physicals and medical treatment in order to participate in university sports to maintain their athletic scholarships, even after

student-athletes complained to athletic directors, coaches, and trainers about the ways Dr. Strauss touched them during medical examinations;

g.      Threatening male athletes' participation in OSU sports if they refused to get physicals and/or medical treatment from Dr. Strauss;

h.      Joking about Dr. Strauss' conduct with other student-athletes; and

i.      Falsely representing to at least one student who reported sexual harassment by Dr. Strauss that there had been no prior complaints about Dr. Strauss and that OSU Student Health had only received positive comments about Dr. Strauss;

112.    OSU willfully allowed Dr. Strauss to prey amongst its male student-athletes and male students, even though many high-ranking officials such as Athletic Directors, Assistant Athletic Directors, Associate Athletic Directors, Head Team Physicians, Team Physicians, and Athletic Trainers could have acted to prevent this systemic sexual abuse.

113.    OSU failed to respond promptly and adequately to address the sexual misconduct of Dr. Strauss and to protect its male student-athletes and male students, which is a blatant violation of Title IX.

114.    OSU, through its acts and omissions, acted with deliberate indifference to the sexual molestation, assault, abuse, and harassment that the Plaintiff as well as other male OSU students endured.  OSU failed to respond to the sexual misconduct of Dr. Strauss and their inaction was clearly unreasonable in light of the known circumstances.

115.    OSU's failure to promptly respond, investigate, and act to investigate complaints and then remedy the situation created by their employee, faculty member, and Team Physician, Dr. Strauss, caused the Plaintiff to experience further sexual molestation, assault, abuse, and harassment and/or made the Plaintiff more vulnerable to it into the future.

116.     OSU's failure to promptly respond, investigate, and act to investigate complaints and then remedy the situation created by their employee, faculty member, and Team Physician, Dr. Strauss, created a sexually hostile environment that effectively denied Plaintiff access to educational opportunities and benefits at OSU, including appropriate medical care. OSU's deliberate indifference was so severe, pervasive, and objectively offensive that it deprived the Plaintiff of access to the educational opportunities or benefits provided by OSU.

117.     As a direct and proximate cause of OSU's blatant violation of Title IX as well as the rights bestowed to Plaintiff under Title IX, Plaintiff has suffered and continues to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life, which will continue into the future. Also, Plaintiff was prevented from and continues to be prevented from obtaining the full enjoyment of life. Plaintiff has sustained and continues to sustain loss of earnings and earning capacity. Finally, Plaintiff has incurred various personal expenses.

118.     OSU's creation of and deliberate indifference to the sexually hostile culture within its athletic and student health programs substantially increased the risk that Plaintiff and other OSU students would be sexually harassed.

119.     The sexual harassment that Plaintiff suffered was so severe, pervasive and objectively offensive that it effectively barred their access to educational opportunities and benefits, including a safe educational environment and appropriate medical care.

## LARKINS HALL

120.    The Plaintiff, an OSU wrestler, mainly trained in their respective sport in Larkins Hall. As such, the Plaintiff, an OSU wrestler, was entitled to use the athletic facilities at Larkins Hall free from sexual molestation, assault, abuse, and harassment.

121.    OSU owed the Plaintiff a duty to investigate and remedy the conditions that made Larkins Hall a sexually hostile and abusive environment.

122.    OSU had actual knowledge of the hostile sexual environment at Larkins Hall.  The Athletic Director, Assistant Athletic Directors, Associate Athletic Directors, and/or Building Supervisor had actual knowledge of the hostile environment and these individuals had the authority to take corrective action as individuals using the facility were required to be students, faculty, staff, and/or employees of OSU.  Yet, these individuals failed any opportunity to rectify the hostile environment at Larkins Hall.

123.    Also, OSU was deliberately indifferent to this hostile environment even though OSU exercised control over Larkins Hall.  In fact, this environment was so severe, pervasive, and objectively offensive that it deprived the Plaintiff wrestler of access to his educational opportunities and/or benefits provided by OSU.

124.    Numerous complaints were made by wrestlers to the former OSU Wrestling Coaches. Athletic Director, an Assistant Athletic Director, and other high-ranking OSU employees. These complaints included but were not limited to the following:

a.      Dr. Strauss was ogling and gawking male student athletes at Larkins Hall while they showered or were in the locker room;

b.      Dr. Strauss was showering with male student athletes for hours at a time, several times a day;

c.      Dr. Strauss was making sexual comments and other inappropriate comments to the male students. In addition, he was calling them at their residences inviting them to dinner, asking them to take semi-nude photographs, and inviting them to his home;

d.      Larkins Hall was a toxic, sexualized place where male voyeurs gathered to gawk and stare and masturbate as the male student athletes showered or stood naked in the locker room, and

e.      Male OSU students were openly having sex with each other on the stairwells and other places in Larkins Hall.

## SECOND CAUSE OF ACTION - VIOLATIONS OF TITLE IX, 20 U.S.C. §1681(a), et seq.

### Deliberate Indifference to Prior Sexual Harassment

125.    Plaintiffs incorporate by reference the allegations set forth and contained in Paragraphs One (1) through Paragraphs One Hundred and Twenty-Four (124) as if fully written herein.

126.    Before Dr. Strauss sexually harassed the Plaintiff, OSU had actual knowledge of Dr. Strauss's prior sexual harassment of male students at OSU.

127.    Based on Dr. Strauss's prior conduct, OSU had actual knowledge of the substantial risk that Dr. Strauss would sexually harass other male students at OSU.

128.    OSU officials, with the knowledge described above, had the authority to address the risk posed, by Dr. Strauss, and had the authority to take corrective measures by, among other things, closely supervising Dr. Strauss, not allowing him to shower with student-athletes, or terminating his employment.

129.    OSU's failure to address the substantial risk posed by Dr. Strauss, given prior complaints and reports about his inappropriate conduct, was clearly unreasonable in light of the known circumstances.

130.    By its acts and omissions, OSU was deliberately indifferent to the substantial risk that Dr. Strauss would sexually harass other male students at OSU.

131.    As a result of OSU's deliberate indifference, Plaintiff was subjected to severe sexual harassment by Dr. Strauss, including sexual assault in the guise of medical care.

132.    The sexual harassment that Plaintiff suffered was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to educational opportunities and benefits, including a safe educational environment and appropriate medical care.

133.    As a direct and proximate result of OSU's deliberate indifference to Dr. Strauss's prior sexual harassment of OSU, which violated Title IX, Plaintiff has suffered and continue to suffer damages and injuries.

## THIRD CAUSE OF ACTION - FRAUDULENT CONCEALMENT

## BY THE OHIO STATE UNIVERSITY

134.    The Plaintiff hereby incorporate by reference Paragraph One (1) through Paragraphs One Hundred and Thirty-Three (133) as fully written herein.

135.    Plaintiff hereby alleges that OSU committed Fraudulent Concealment by committing Fraud, as previously described in detail in this Amended Complaint and also described hereafter. OSU concealed the existence of Plaintiffs' claims, by making material representations to Plaintiff involving past or existing facts at the time of Dr. Strauss' sexual assaults, by representing, insinuating or doing the following:

    a.    Defendant Strauss' examinations were "medically appropriate"; and

    b.    Defendant Strauss' conduct was "not sexual abuse"; and

    c.    Continuing to employ Dr. Strauss as a medical doctor thereby representing that Strauss was not a sexual deviant despite actual and/or constructive knowledge that he was a

30

sexual deviant who engage in acts of sexual abuse at the OSU Student Health Center, Larkins Hall, and other buildings at the OSU campus.

136.    These material representation(s) to Plaintiffs were false, in that OSU had actual knowledge of sexual abuse by Dr. Strauss from other students and student athletes on the OSU campus and knew that the appropriateness of his "treatment(s)" had been questioned in the past. Further, OSU continued to employ Dr. Strauss, thereby providing him unfettered access to hundreds of males including Plaintiff.

137.    OSU made the material representations(s) with the intent that the material representation(s) should be acted upon by the Plaintiff, and that each Plaintiff should believe the following:

      a.    That the "treatments" were in fact "treatments;"

      b.    That the "treatment(s)" or examinations were proper, appropriate, and legitimate;

      c.    That he had not been sexually assaulted;

      d.    That he should believe Dr. Strauss was a legitimate doctor who did not commit sexual assault; and

      e.    That he should not reasonably believe and not be aware of a possible lawsuit or cause of action that he might have against OSU.

138.    Plaintiff acted in reliance upon the material representations(s), in that the Plaintiff reasonably believed the following:

      a.    That the "treatments" were in fact "treatment";

      b.    That the "treatment" or examinations were proper, appropriate, and legitimate;

      c.    That they had not been sexually assaulted;

      d.    That they should continue the "treatment(s);"

    e.      That Dr. Strauss was a legitimate doctor who did not engage in sexual assault;

    f.      That they did not have and were not aware of a possible lawsuit or cause of action that they had against OSU.

139.   Plaintiff thereby was injured, in that Plaintiff suffered in the following ways:

    a.      Plaintiff could not stop the sexual assault;

    b.      Plaintiff continued to undergo the "treatment(s)" or examinations resulting in sexual assaults; and

    c.      Plaintiff suffered related physical manifestations thereof, such as sleep deprivation, physical illness, severe emotional distress, loss of familial relationships, loss of enjoyment of life. In addition, Plaintiff will continue to suffer pain of the mind and body, and will continue to be prevented from performing daily activities and obtaining full enjoyment of life. Further, some Plaintiffs will continue to sustain loss of earnings and earning capacity.

140.   OSU concealed the fraud as to Dr. Strauss by making fraudulent material representations to Plaintiff that were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of this fraud as to Dr. Strauss.

141.   OSU continued to employ Dr. Strauss as a medical doctor thereby representing that Strauss was not a sexual deviant despite actual and/or constructive knowledge that he was a sexual deviant who engaged in acts of sexual abuse on OSU students at the OSU Student Health Clinic, Larkins Hall, and other buildings on the OSU campus.

142.   Dr. Strauss published the following articles in regards to Anabolic Steroids while employed at OSU:

    a.    **<u>Side Effects of Anabolic Steroids in Weight-Trained Men</u>**
        Richard H. Strauss, J.E. Wright, G.A. Finerman, D.H. Catlin.

Phys Sportsmed, December, 1983

b.    **<u>Anabolic Steroids</u>**
Richard H. Strauss.
Clinical Sports Medicine.  July, 1984

c.    **<u>Anabolic Steroid Use and Perceived Effects in Ten Weight-Trained Women Athletes</u>**
Richard H. Strauss, M.T. Liggett, R.R. Lanese.
The Journal of the American Medical Association (JAMA), May, 1985

d.    **<u>Controlling the Supply of Anabolic Steroids</u>**
Richard H. Strauss.
Phys Sportsmed, May 1987

e.    **<u>Selected Psychological Characteristics of Anabolic-Androgenic Steroid Users</u>**
M.S. Bahrke, J.E. Wright, J.S. O'Connor, Richard H. Strauss, D.H. Catlin.
New England Journal of Medicine, September. 1990

d.    **<u>Anabolic Steroids in the Athlete – Annual Review of Medicine</u>**
1991 – Paper adopted in part from the authors' chapter "Drugs in Sports" in Sports Medicine, edited by Richard H. Strauss Philadelphia: Saunders (1991) 2nd Edition

e.    **<u>Endrocrine Effects in Female Weight Lifters Who Self-Administer Testosterone and Anabolic Steroids</u>**
W.B. Markley, Richard H. Strauss, D.J. Leizman, M. Liggett, L.M. Demers, November, 1991

f.    **<u>Psychological Moods and Subjectivity Perceived Behavioral and Somatic Changes Accompanying Anabolic-Androgenic Steroid Use</u>**
M.S. Bahrke, J.E. Wright, Richard H. Strauss, D.H. Catlin.
American Journal of Sports Medicine, November – December 1992

143.    Dr. Lombardo, OSU head team physician, authored or co-authored the following articles

in regards to Anabolic Steroids while employed at OSU:

a.    **<u>The Effects of Anabolic Steroids and Strength Training on the Human Immune Response</u>**
Calabrese LH, Kleiner SM, Barna BP, Skibinski CL, Kirkendall DT, Lahita RG, John A. Lambardo
Medicine and Science in Sport and Exercise August 1989

b.    **<u>Anabolic-Androgenic Steroids</u>**
JA Lombardo NIDA Research Monograph 1990

c.     **Anabolic Steroids in Athletes**
       Yesalis CE, Wright JE John A. Lombardo
       Wien Medizinishe Wochenschrift 1992 German

d.     **Psychiatric Effects and Psychoactive Substance Use in Anabolic-Androgenic Steroid Users**
       Malone DA Jr., Dimeff RJ, John A. Lombardo, Sample RH Clinical Journal of Sports Medicine 1995

e.     **Steroids and Steroid-Like Compounds**
       Blue, JG, John Lombardo
       Clinics in Sports Medicine Journal 1999 July

f.     **Performance-Enhancing Supplements**
       Pecci MA, John A. Lombardo
       Physical Medicine and Rehabilitation Clinics of North America November 2000

g.     **Supplements and Athletes**
       John A. Lombardo
       Southern Medical Journal September 2004

144.    Plaintiff states that he received and/or witnessed Dr. Strauss administering steroids and/or performance enhancing drugs to athletes at OSU in order for the athletes to "get an edge." These drugs include but are not limited to: Ephedrine, Creatine, Clenbuterol, and "Animal Juice," a name given to an unknown substance that's label stated, "for animal use only." Plaintiff state that not only did Strauss regularly administer Anabolic Steroids, but athletes at OSU were also able to receive injections of Corticosteroids like Decadron in order to immediately cure the athletes' pain and keep the OSU athletes running at a high level at all times.

145.    Plaintiff states that Dr. Strauss told athletes that the substance would boost their athletic performance. However, rarely was any OSU athlete ever taking any of these drugs listed above, counseled by Dr. Strauss as to any potential side effects that the steroid and/or performance enhancing drug might have. In fact, in a 1983 article titled Social Factors in Wrestlers' Health

Problems, written by Dr. Strauss and published in The Physician and Sportsmedicine, Dr. Strauss discussed that wrestlers were highly motivated by social pressures to win. Further, he stated, "[w]restlers tend to take seriously only those health problems that prevent participation, regardless of the long-term consequences."

146.     On information and belief, Plaintiff state that Dr. Strauss was receiving the steroids and/or performance enhancing drugs that he distributed from the OSU Athletes from OSU Student Health Center.

**FOURTH CAUSE OF ACTION – VIOLATIONS OF TITLE IX 20 U.S.C. §1681(a), et seq.**

**Unlawful Retaliation Claim**

147.     The Plaintiff hereby incorporate by reference the allegations set forth and contained in Paragraphs One (1) through Paragraphs One Hundred and Forty-Six (146) as if fully written herein.

148.     Retaliatory conduct is within the broad prohibition of discrimination made unlawful by Title IX.

149.     Plaintiff states that he engaged in the protective activity of reporting and disclosing the rampant sexual molestation, assault, abuse, and sexual harassment that occurred from the years 1979-1998 at OSU by OSU employee, faculty member, and Team Physician, Dr. Strauss. Also, the Plaintiff exposed the sexually hostile environment that existed at Larkins Hall.

150.     On May 15, 2019 the Perkins Coie Report was issued and the contents of the report soon became local news as well as nationwide news and put OSU in a very negative and unfavorable light to the general public.

151.     OSU employees, faculty, staff, former employees of OSU became aware of at least some of the portions of the Perkins Coie Report and that there were public allegations by some OSU

wrestlers that when Congressmen Jim Jordan was the Head Assistant OSU Wrestling Coach they had told him about Dr. Strauss sexually harassing some of the male wrestlers. Several of these wrestlers were adamant that they had reported Dr. Strauss to Jim Jordan.

152.    As a result, certain OSU employees, faculty, staff, former employees of OSU, friends, and/or benefactors of OSU recklessly, intentionally and/or deliberately tried to disparage the Plaintiff and/or silence his voice so these Plaintiff's reports and disclosures of the rampant sexual, molestations, abuse and harassment by OSU employee Dr. Strauss, OSU's indifference and intentional concealment of Dr. Strauss' sexual harassment and sexual escapades, and Congressmen Jordan's actual knowledge of Dr. Strauss' sexual harassment at the time he was an OSU wrestling coach would not be believed by the general public or come to further light.

153.    In July 2018, one current OSU employee Matt Finkes gave a public interview on Columbus radio station QFM 96.3.  During his interview, the OSU employee tried to paint a derogatory picture of the Plaintiffs in this lawsuit and similarly situated Plaintiffs in other lawsuits as he stated that the reports concerning Dr. Strauss and OSU were basically a "money grab".  Also, the Matt Finkes pointed out that OSU would not simply lay down the way Michigan State had done.

154.    In the summer of 2018, OSU employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU emailed, texted, and/or called some Plaintiffs and in this lawsuit similarly situated Plaintiffs in other lawsuits order to get the Plaintiffs and similarly situated Plaintiffs to not reveal their individual stories and/or silence them.

155.    Further, in the summer of 2018 OSU employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU emailed, texted, and/or called some of the Plaintiffs in

this lawsuit and similarly situated Plaintiffs in other OSU lawsuits in order to assess the extent of the damage that Defendant OSU could face in a possible lawsuit.

156.    On information and belief, OSU has not taken disciplinary action or any other action against these OSU employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU that emailed, texted, and/or called the Plaintiffs and similarly situated other Plaintiffs.  As such, OSU has ratified these individuals' actions and independently violated Title IX.

## FIFTH CAUSE OF ACTION – VIOLATION OF SECTION 1983 (42 U.S.C. § 1983)

157.    The Plaintiffs hereby incorporate by reference the allegations set forth and contained in Paragraphs One (1) through Paragraphs One Hundred and Fifty-Six (156) as if fully written herein.

158.    Plaintiffs enjoys protections under the Fourteenth Amendment of the United States Constitution.

159.    Plaintiffs enjoy the constitutionally protected Due Process right to be free from invasion of bodily integrity through sexual assault, battery, molestation, and harassment under the Fourteenth Amendment to the United States Constitution.

160.    At all times herein, Ohio State and its employees, agents, and/or representatives were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of The Ohio State University and State of Ohio.

161.    The acts as alleged throughout this Complaint demonstrate a violation of these constitutionally protected rights, which were clearly established at the time of the acts and of which OSU had knowledge.

162.    OSU had the ultimate responsibility and authority to train and supervise its employees, agents, and representatives, in the appropriate manner of preventing, detecting, investigating and reporting sexual abuse, assault, and molestation and as a manner of custom, policy, and/or practice failed to do so with deliberate indifference.

163.    At all times pertinent herein, OSU acted in supervisory role to Dr. Strauss.

164.    By failing to prevent the repeated sexual assaults, abuse, and molestation and other sexual deviant acts upon the Plaintiffs, and by failing to appropriately respond to numerous reports of Dr. Strauss' sexual assault, abuse, and molestation in a manner that was clearly unreasonable it amounts to deliberate indifference for which, OSU is liable to Plaintiff pursuant to 42 U.S.C. §1983.

550.    OSU is also liable to Plaintiff under 42 U.S.C. §1983 for maintaining customs, policies, and practices that deprive Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

551.    As a direct and proximate result of OSU's violation of Plaintiff's rights under 42 U.S.C. §1983, Plaintiff has suffered and continue to suffer emotional distress, physical manifestation of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life; were prevented and continue to be prevented from obtaining the full enjoyment of life; and have incurred various personal expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Honorable Court:

a.      Enter judgment in favor of Plaintiff on his First, Second, Third and Fourth causes of action under Title IX 20 U.S.C. §1681(a), et seq. against Defendant The Ohio State University;

b.      Declare Defendant The Ohio State University's conduct in violation of Title IX of the Education Amendments of 1972;

c.      Declare Defendant The Ohio State University's conduct in violation of 42 U.S.C. §1983;

d.      Award Plaintiff compensatory damages in amounts to be established at trial, including, without limitation, payment of Plaintiff's medical and other expenses incurred as a consequence of the sexual abuse and/or harassment, OSU's deliberate indifference, OSU's fraudulent concealment, and OSU's unlawful retaliation; damages for deprivation of equal access to the educational opportunities and benefits provided by OSU; and damages for past, present, and future emotional pain and suffering, ongoing mental anguish, loss of past, present and future enjoyment of life, and loss of future earnings and earning capacity;

e.      Award Plaintiff pre-judgment and post-judgment interest;

f.      Award Plaintiff their court costs and expenses, including attorney's fees, pursuant to 42 U.S.C. § 1988 (b); and

g.      Grant such other relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff demand a trial by jury on all issues in the above-mentioned Complaint.

Respectfully Submitted,

__/s/ J.C. Ratliff_____
J.C. Ratliff (0027898)
200 W. Center St.
Marion, Ohio 43302
Tel:  740-383-6023
Email:  attorney.ratliff@gmail.com